## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HARRIS SILVER and ENTITY X, LLC**<br>245 6th Avenue Suite #1<br>Venice, CA  90291 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. _____ |
| | : | |
| **HAROLD CHASE LENFEST**<br>1100 Ginkgo Lane<br>Gladwyne, PA  19035 | : | |
| | : | |
| **KEVIN MURPHY**<br>322 West 57th Street, Apt. 48H<br>New York, NY  10019 | : | **VERIFIED COMPLAINT** |
| | : | |
| **MELVIN YELLIN**<br>1136 Fifth Avenue<br>New York, NY  10028 | : | |
| | : | |
| **HIGH STREET CAPITAL PARTNERS**<br>**MANAGEMENT, LLC**<br>366 Madison Avenue, 11th Floor<br>New York, NY  10017 | : | |
| | : | |
| **HIGH STREET CAPITAL PARTNERS, LLC**<br>366 Madison Avenue, 11th Floor<br>New York, NY 10017 | : | |
| | : | |
| **PRIME WELLNESS OF**<br>**PENNSYLVANIA, LLC**<br>210 Wyoming Avenue<br>Scranton, PA  18503 | : | |
| | : | |
| **HCL MM INVESTMENTS PA, LLC**<br>565 E. Swedesford Road, Suite 303<br>Wayne, PA  19087 | : | |
| | : | |
| Defendants. | : | |

## INTRODUCTION

1.      This case arises out of the Defendants' fraudulent scheme to dupe Plaintiff Harris Silver into helping them obtain a cannabis license from Pennsylvania and then cheat Mr. Silver out of the compensation they had agreed to pay him.

2.      The High Street Capital Defendants purport to be successful investors in the fast-growing field of licensed cannabis cultivation and dispensing and are seeking to cash in via an initial public offering of securities in the cannabis-related businesses they own.

3.      But in fact, the High Street Capital Defendants have suffered a string of failures in their efforts to actually obtain the cannabis licenses they sought. For example, the High Street Capital Defendants applied for but failed to obtain cultivation licenses in Massachusetts, Connecticut, Illinois, New York, and Maryland.

4.      Following their repeated losses, the High Street Capital Defendants realized that they lacked the necessary expertise to obtain cannabis licenses on their own.

5.      Accordingly, the High Street Capital Defendants sought help from Harris Silver, who has extensive experience with cannabis licensing issues and was instrumental in obtaining cannabis licenses in Connecticut and Illinois, *i.e.*, some of the same licenses that the High Street Capital Defendants were unable to win on their own.

6.      The High Street Capital Defendants used Mr. Silver's services in two ways: (i) first, they relied on and invoked his expertise to convince Defendant H. Chase Lenfest to enter into a joint venture with them to pursue cannabis licenses in Pennsylvania; and (ii) second, the High Street Capital Defendants and Mr. Lenfest then relied on Mr. Silver to quarterback their efforts to actually obtain those licenses.

2

7.      In return for Mr. Silver's extensive work, Defendants agreed to compensate Mr. Silver as follows: (i) $180,000 to prepare their application, and (ii) in the event they were awarded a cultivation and processing license, a $150,000 cash bonus and a 4% non-dilutable equity stake in any licensee, and (iii) an ongoing, salaried management role with the licensee as Chief Marketing Officer.

8.      In addition, Defendants promised Mr. Silver that, if they were awarded a license, Mr. Silver would be the project manager during the buildout of their cannabis cultivation facility. Mr. Silver would also retain an ownership interest in all cannabis products he developed so that he would benefit economically when those products were used in other states and also be involved in bringing them to market.

9.      After months of intensive effort, Mr. Silver prepared an exemplary application for the Defendants, and they were ultimately awarded a cannabis cultivation and processing license.

10.     At that point, Mr. Silver should have received his cash bonus and equity stake and began his role as Chief Marketing Officer and project manager for the licensee.  But despite numerous requests, Mr. Silver has received neither his cash bonus nor his equity stake, and Defendants have refused to give him the salaried position at the licensee that he was promised.

11.     Defendants' refusal to abide by the agreement with Mr. Silver amounts to a breach of contract by all of them, for which they are all jointly and severally liable.

12.     It is also amounts to fraud by the Defendants, because it is clear from their words and conduct that they never intended to abide by the promises they made to Mr. Silver.  Instead, they only used him to obtain a license without ever having any intention of properly compensating him for his efforts.

3

13.     Accordingly, Mr. Silver has no choice but to bring this lawsuit to ensure that he receives the compensation to which he is entitled.

## THE PARTIES

### Harris Silver and Entity X, LLC

14.     Plaintiff Harris Silver is a U.S. citizen who permanently resides in Los Angeles, California. Accordingly, he is a citizen of the State of California.

15.     Plaintiff Entity X, LLC is a single-member limited liability company whose sole member is Harris Silver. Accordingly, Entity X, LLC is a citizen of the State of California.

### The High Street Capital Defendants

16.     Upon information and belief, Defendant Kevin Murphy is the Managing Partner of Defendant High Street Capital Partners Management, LLC and a member of Defendant High Street Capital Partners, LLC. Accordingly, any conduct by Mr. Murphy in the course of his employment is imputed to Defendant High Street Capital Partners Management, LLC as a matter of law.

17.     Upon information and belief, Mr. Murphy is a U.S. citizen who permanently resides in the State of New York. Accordingly, Mr. Murphy is a citizen of the State of New York.

18.     Upon information and belief, Defendant Melvin Yellin is employed by and is a member of Defendant High Street Capital Partners Management, LLC and the Managing Director of Defendant High Street Capital Partners, LLC. Accordingly, any conduct by Mr. Yellin in the course of his employment is imputed to Defendants High Street Capital Partners Management, LLC and High Street Capital Partners, LLC as a matter of law.

4

19.     Upon information and belief, Mr. Yellin is a U.S. citizen who permanently resides in the State of New York. Accordingly, Mr. Yellin is a citizen of the State of New York.

20.     Upon information and belief, Defendant High Street Capital Partners Management, LLC is a Delaware limited liability company that is headquartered in New York, New York and is the Managing Member of Defendant High Street Capital Partners, LLC. Accordingly, any conduct by Defendant High Street Capital Partners Management, LLC or any of its managers, members or agents acting with the scope of its authority as Managing Member of Defendant High Street Capital Partners, LLC is imputed to Defendants High Street Capital Partners, LLC as a matter of law.

21.     Upon information and belief, all of the members of Defendant High Street Capital Partners Management, LLC are U.S. citizens who permanently reside in the State of New York. Accordingly, Defendant High Street Capital Partners Management, LLC is a citizen of the State of New York.

22.     Upon information and belief, Defendant High Street Capital Partners, LLC is a Delaware limited liability company that is headquartered in New York, New York and is a member of and the Manager of Defendant Prime Wellness of Pennsylvania, LLC.

23.     Upon information and belief, all of the members of Defendant High Street Capital Partners, LLC are citizens of the State of New York. Accordingly, Defendant High Street Capital Partners, LLC is a citizen of the State of New York.

24.     This Complaint refers to Defendants Kevin Murphy, Melvin Yellin, High Street Capital Partners Management, LLC, and High Street Capital Partners, LLC collectively as the "High Street Capital Defendants." This Complaint also refers to High Street Capital Partners Management, LLC as "High Street Capital."

25.     This Court may exercise personal jurisdiction over the High Street Capital Defendants because this case arises out of conduct by the High Street Capital Defendants that occurred within Pennsylvania and conduct that was specifically directed to Pennsylvania.

**Lenfest Parties**

26.     Upon information and belief, Defendant Harold Chase Lenfest is a U.S. citizen who resides in Montgomery County, Pennsylvania.  Accordingly, Mr. Lenfest is a citizen of the State of Pennsylvania and is subject to general personal jurisdiction in this state.

27.     Upon information and belief, Defendant HCL MM Investments PA, LLC is a limited liability company that is headquartered in Wayne, Pennsylvania.  Accordingly, HCL MM Investments PA, LLC is subject to general personal jurisdiction in this state.

28.     Upon information and belief, all of the members of HCL MM Investments PA, LLC are citizens of the State of Pennsylvania.  Accordingly, HCL MM Investments PA, LLC is a citizen of the State of Pennsylvania.

29.     This Complaint refers to Defendants Harold Chase Lenfest and HCL MM Investments PA, LLC collectively as the "Lenfest Parties."

**Prime Wellness of Pennsylvania**

30.     Defendant Prime Wellness of Pennsylvania, LLC ("Prime Wellness") is headquartered in and has its principal place of business in Berks County, Pennsylvania. Accordingly, Prime Wellness is subject to general personal jurisdiction in Pennsylvania.

31.     Prime Wellness holds a cannabis license from the Commonwealth of Pennsylvania.

6

32.    The members of Prime Wellness are Defendant High Street Capital Partners, LLC and HCL MM Investments PA, LLC.  Accordingly, Prime Wellness LLC is a citizen of the States of New York and Pennsylvania.

33.    Prime Wellness is a manager-managed LLC in which the managers, rather than members, have operational control of the business.

34.    Upon information and belief, the current managers of Prime Wellness are High Street Capital Partners, LLC and HCL MM Investments PA, LLC.

## SUBJECT MATTER JURISDICTION AND VENUE

35.    Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the federal securities law claim in this lawsuit (Count V) and supplemental jurisdiction under 28 U.S.C. § 1367(a) over all of the state law claims because they form part of the same case or controversy as the federal securities claim.

36.    Pursuant to 28 U.S.C. § 1332, this Court also has diversity jurisdiction over this lawsuit because there is complete diversity and the amount in controversy is in excess of $75,000.

37.    Plaintiffs are citizens of California, and the Defendants are citizens of Pennsylvania and New York.  Accordingly, there is complete diversity.

38.    Defendants have wrongly refused to pay Plaintiffs, among other things, a $150,000 cash bonus and a 4% equity stake in the cannabis licensee.  The 4% equity stake is worth considerably more than $1 million.  Accordingly, the amount in controversy is far in excess of $75,000.

39.    Venue lies in this District because all of the Defendants are inhabitants of this District or transact business here, *see* 15 U.S.C. § 78aa, at least one act or transaction

constituting the securities fraud violation occurred in this District, *see id.*, and a substantial part of the events or omissions giving rise to the claims occurred in this District, *see* 28 U.S.C. § 1391(b)(2).

## FACTS

### I.     The Cannabis Industry

40.     Over the last several years, many states have legalized the cultivation, processing and dispensing of cannabis products in certain circumstances.

41.     Typically, an entity must apply for and obtain one of a very limited number of licenses from a state in order to lawfully cultivate, process or dispense cannabis products in that state.

42.     Because states typically award very few licenses, they are viewed as highly valuable, and the process to win one is highly competitive.

43.     To put together a strong application, an applicant must compile a detailed and comprehensive plan that covers numerous topics, including facility design, security, compliance with state regulations and the applicant's ability to fund the startup of the business and properly manage its operations.

### II.    Harris Silver Helps Obtain Cannabis Licenses That High Street Capital Fails To Win

44.     High Street Capital is a New York investment firm founded, led and controlled by Defendants Kevin Murphy and Melvin Yellin.

45.     In its marketing materials, High Street Capital claims to be a "leader within the emerging medical cannabis industry" that "possesses a broad understanding of the medical cannabis space including knowledge and experience operating businesses within strict regulatory environments."

8

46.     But in fact, time and time again, High Street Capital has failed to obtain licenses in several states because it actually lacks the expertise necessary to successfully prepare and submit winning applications.

47.     In addition, High Street Capital lacks the expertise to successfully operate cannabis businesses in heavily regulated environments.

48.     For example, in 2013, High Street Capital sought a cannabis cultivation license in Connecticut but failed to obtain one.

49.     Similarly, in 2014, High Street Capital failed to win a cannabis cultivation license in Illinois.

50.     Meanwhile, Harris Silver spearheaded the applications that actually won the cultivation licenses in Connecticut and Illinois that High Street Capital coveted but failed to win.

51.     Mr. Silver has extensive experience and connections in the cannabis industry.

52.     For example, Mr. Silver has a Master of Arts in Architecture and has been at the forefront of developing energy efficient building systems for the cannabis industry.  Indeed, teams that he has led have spent hundreds of hours in design research that have led to state-of-the-art and industry-leading energy-efficient designs.

53.     In addition, Mr. Silver has extensive experience in advertising and branding and has led the development of advanced medical cannabis products, with an emphasis on formulation consistency and dose-controlled pharmaceutical packaging.

54.     Mr. Silver has also been a leader in developing clear and concise labeling and child-safe packaging across the entire family of cannabis products.

55.     Mr. Silver has used his extensive experience, knowledge and skills to lead successful cannabis licensing applications in several states.

9

56.     For instance, the successful application that he quarterbacked in Connecticut was the highest scoring application in the state.

57.     Similarly, the application Mr. Silver led and submitted in Illinois was the highest scoring application in its district.

## III.    High Street Capital Knows It Cannot Beat Mr. Silver, So It Purports To Invite Him To Join As A Partner

58.     After being defeated by Mr. Silver's applications in Connecticut and Illinois and failing to win in all of their other attempts to be awarded cultivation licenses, High Street Capital realized it needed his expertise and would rather have him working on their side.

59.     In addition, High Street Capital was hoping to conduct an initial public offering ("IPO") of equity in its cannabis business.  To bolster the value of its cannabis business, High Street Capital wanted to show investors that it could win the types of competitive license application processes that Mr. Silver had shown he could win.

60.     Accordingly, in the summer of 2016, High Street Capital and Mr. Silver began discussing whether they should work together on future applications.

61.     By early fall 2016, the talks had progressed to the point that High Street Capital and Mr. Silver discussed the terms on which he would join High Street Capital as a partner and lead all of its future license applications.

## IV.    High Street Capital Uses Mr. Silver To Obtain A Partnership With Chase Lenfest

62.     While those discussions were ongoing, Kevin Murphy and Melvin Yellin of High Street Capital asked Mr. Silver to accompany High Street Capital representatives to a meeting in Philadelphia at the downtown apartment of Defendant H. Chase Lenfest.

63.     The purpose of the meeting was to convince Mr. Lenfest to join High Street Capital's application for a Pennsylvania cannabis license.

64.     High Street Capital sought Mr. Lenfest's involvement because (i) the Lenfest name carries great weight in Pennsylvania; (ii) they could use Mr. Lenfest's numerous charitable activities to bolster their application; and (iii) Mr. Lenfest's great wealth and connections could provide the capital necessary to fund the startup of the business in the event they were awarded a license.

65.     Although Mr. Silver did not have a final agreement to join High Street Capital, he agreed to go to the meeting with Mr. Lenfest on the understanding that his deal would be finalized in short order.

66.     Mr. Silver spent several days preparing for the meeting, including preparing a binder of materials to be shared with Mr. Lenfest. Those materials included, among other things, samples of cannabis products, information about the cannabis facility that Mr. Silver had designed and built for his Illinois application and a detailed diagram of all of the steps necessary to prepare a high-quality application.

67.     No one from High Street Capital provided any input into those materials or even bothered to review them prior to the meeting.

68.     In addition to Mr. Silver, Kevin Murphy and Chris Tolford attended the meeting for High Street Capital. Mr. Lenfest also personally attended the meeting, along with his advisors Christopher Noe and Thomas Pasch.

69.     After introductory remarks by Mr. Murphy, he turned the meeting over to Mr. Silver, who presented the detailed materials that he had prepared.

70.     Mr. Silver's presentation immediately sparked the interest of Mr. Lenfest and his associates.

11

71.     For example, Mr. Noe explained that Mr. Lenfest and his team had already met with many others who wanted to partner with Mr. Lenfest on a cannabis application, but Mr. Silver's presentation was the first time that anyone had provided a roadmap for how to actually prepare a successful application.

72.     In addition, Mr. Silver was the first person who had shown that he had the necessary real world experience to actually win a competitive application process.

73.     Shortly after the meeting, Mr. Noe confirmed in writing how impressed he was with Mr. Silver's presentation and advised that Mr. Lenfest was leaning towards partnering with High Street Capital.

74.     Shortly thereafter, Mr. Lenfest and High Street Capital did in fact agree to jointly pursue cannabis application licenses in Pennsylvania.

**V.      High Street Capital Repudiates Its Promise Of A Partnership With Mr. Silver, And Agrees To Compensate Him For Work On The Pennsylvania License Application**

75.     After it appeared that Mr. Silver had successfully brought Mr. Lenfest on board, High Street Capital promptly backed away from its promise to bring Mr. Silver on as a full partner.

76.     Instead, High Street Capital now proposed that any agreement with Mr. Silver be limited to the Pennsylvania application process.  According to High Street Capital, if that application process worked out, then it would revisit a broader partnership relationship with Mr. Silver.

77.     Mr. Silver was greatly disappointed by High Street Capital's about-face, but continued to believe that High Street Capital would act in good faith toward him.

78.     Accordingly, Mr. Silver agreed to the more limited relationship that Mr. Murphy requested. But High Street Capital continued to drag its feet on actually putting any agreement with Mr. Silver in writing.

79.     To move the ball forward, Mr. Silver traveled at his own expense to a conference in Las Vegas to meet with Mr. Murphy in person. At that conference, Mr. Murphy assured Mr. Silver that Mr. Lenfest had agreed to work with High Street Capital and that they and Mr. Silver would all work together.

80.     Following the meeting in Las Vegas, Mr. Silver had several telephone conversations with Mr. Yellin about the compensation he would receive for working on the Pennsylvania application.

81.     During those calls, Messrs. Silver and Yellin agreed that, in return for preparing the Pennsylvania application, Mr. Silver and his wholly-owned LLC, Plaintiff Entity X, LLC, would receive, among other things, $180,000 upfront, and, if Defendants were awarded a cultivation and processing license, an additional $150,000 in cash, a 4% non-dilutable equity interest in the licensee, and a salaried position as the Chief Marketing Officer of the licensee.

82.     At Mr. Yellin's request, Mr. Silver prepared a term sheet reflecting the terms to which they had orally agreed. Mr. Silver created the document on Google Docs and shared it with Messrs. Yellin and Murphy.

83.     After receiving the document, Mr. Yellin assured Mr. Silver that a written contract, which Mr. Yellin would prepare, would be signed by January 15, 2017.

84.     Mr. Silver, Mr. Lenfest and the High Street Capital Defendants understood that the proposed licensee on the applications that Mr. Silver would prepare would be Prime Wellness.

13

85.     But at that time, Prime Wellness's LLC agreement had not been drafted, and it had no bank accounts, assets or employees of its own. Thus, Prime Wellness itself effectively did not exist and could not itself pay Mr. Silver.

86.     Thus, in addition to Prime Wellness itself being obligated to pay Mr. Silver, High Street Capital and Mr. Lenfest were also responsible for paying him because they, or their agents, were the ones who made the promises to Mr. Silver and entered into the agreements with him, they were the ones who would benefit personally from the work he did, and they were the promotors of Prime Wellness.

87.     Thus, throughout the various negotiations discussed above and below, Messrs. Murphy and Yellin acted as the agents of High Street Capital, Prime Wellness and Mr. Lenfest.

## VI.    Mr. Silver Receives An Initial Payment And Immediately Begins Working For High Street Capital And Mr. Lenfest

88.     Consistent with the agreement Mr. Yellin made with Mr. Silver during their telephone conversations, High Street Capital wired Mr. Silver an initial payment of $90,000 on December 16 and he immediately began to work for High Street Capital and Mr. Lenfest.

89.     Notably, however, High Street Capital and Mr. Lenfest did not ask Mr. Silver to begin working on the Pennsylvania application. Instead, Mr. Silver was asked to immediately prepare a research proposal that Mr. Lenfest wanted to submit to Drexel University.

90.     Unbeknownst to Mr. Silver, Mr. Lenfest had wanted to seek a cannabis-related research grant from Drexel University, but had missed an important deadline for submitting the application for it.

91.     Drexel agreed to extend the deadline for Mr. Lenfest, who shared the opportunity with his new partners at High Street Capital.

92.     Mr. Silver promptly set to work on the Drexel proposal and worked very closely with Mr. Lenfest's associates, including Mr. Noe, to complete it. Specifically, Mr. Silver devoted all of his time and worked around the clock to complete the application, which was submitted on time.

93.     Mr. Silver only agreed to do any work on the Drexel application -- and later to prepare the Pennsylvania cannabis application -- because of the promises Mr. Yellin made during his phone calls with him in December of 2016 and Kevin Murphy's personal assurances that he would receive the compensation that had been promised to him.

## VII.     Mr. Silver Takes Charge Of The Pennsylvania Application

94.     After he completed the Drexel research proposal, Mr. Silver turned his attention to the Pennsylvania cannabis application.

95.     In January 2017, at High Street Capital's request, Mr. Silver temporarily moved to New York to work out of High Street Capital's offices there, so that he would be close to the High Street Capital team that was to support his efforts to prepare the application.

96.     Upon Mr. Silver's arrival in New York, it immediately became clear to him that High Street Capital's Pennsylvania application process was in disarray. In particular, High Street Capital's personnel were focused on the upcoming IPO and on its other cannabis businesses, which were performing poorly. Also, the resources and the team that Mr. Silver was told he would have to help him with the application were non-existent.

97.     In addition, it was apparent that High Street Capital simply did not know how to put together a successful application, because even the most basic decisions had not been made.

98.     For example, given High Street Capital's purported experience in the cannabis industry, Mr. Silver expected that the CEO, COO, CFO, Cultivators and Extractors for the

proposed licensee would already be in place and contributing to the application. But in fact, there was no team.

99.     Similarly, an essential aspect of the application process required a prospective licensee to show control over appropriate real estate for its cultivation facility. But, once again, High Street had not lined up any real estate and had done no analyses on where the business should be located.

100.    High Street Capital has also failed to line up appropriate consulting experts. Many parts of the application require consulting with subject-matter experts in fields like horticulture. Given High Street Capital's purported experience in the industry, Mr. Silver was told that High Street Capital had in-house experience on these matters and an available network of potential experts.

101.    But High Street Capital in fact had no internal expertise nor any external network that Mr. Silver could tap into.

102.    Indeed, High Street Capital ultimately failed to locate or to provide any subject matter experts that could actually be used to support the application. Instead, the few experts that High Street Capital recommended missed multiple deadlines and ultimately never contributed one word to the application.

103.    In short, High Street Capital had done essentially nothing to get the application process started and lacked the knowledge or expertise to do so. Accordingly, Mr. Silver had to take control of the entire process immediately and work day and night to produce a high quality application.

104.    Over the next several months, Mr. Silver devoted all of this time and effort to getting the application ready. In addition to overseeing the entire process, he:

- led the design of the energy-efficient building systems to grow and process cannabis, including hiring, briefing and working with the architects;

- designed the dispensaries to sell the cannabis products;

- led the branding efforts, including hiring, briefing and working with an outside branding agency;

- modified an existing trademarked brand of cannabis products that he had previously developed to be used in PA;

- located appropriate real estate for a cannabis cultivation facility and negotiated lease options and sales contracts related to that real estate;

- identified and recruited the members of the executive team of the prospective licensee;

- located all of the subject matter experts necessary to complete the application; and

- assumed personal responsibility for every word and image in the application, and personally wrote the application almost in its entirety.

## VII.   While Mr. Silver Devoted His Efforts To the Application, Defendants Dragged Their Feet On Signing His Contract

105.    While Mr. Silver worked around the clock in January, February and into March to prepare the Pennsylvania application, he remained without a signed, written agreement memorializing the oral agreement he reached with Mr. Yellin in December.

106.    In his regular emails to, among others, Messrs. Murphy, Yellin, Lenfest and Noe updating them on the status of the application, Mr. Silver reminded them that his agreement should be memorialized in a formal, signed document.

107.    Defendants, however, continually dragged their feet on signing a contract with Mr. Silver, assuring him that they were simply too busy at the moment but would get to it. These false promises and reassurances were specifically designed to induce Mr. Silver to continue working on the application, even though Defendants had no intention of paying him what they had promised.

108.    On March 11, Mr. Silver met with Mr. Murphy to discuss Mr. Silver's
relationship with High Street Capital after the Pennsylvania application was completed.

109.    At that meeting, Mr. Murphy assured Mr. Silver that (i) Mr. Silver would remain
the point person for High Street Capital's applications in other states, (ii) Mr. Silver would retain
an interest in and leadership role with respect to any branded products that were launched in
other states, (iii) any tax consequences arising from Mr. Silver's equity interest not being listed
as founder's shares on the Pennsylvania applications would be borne by High Street Capital, Mr.
Lenfest and/or Prime Wellness, (iv) the work Mr. Silver created would be used only in
connection with the Defendants' activities in Pennsylvania, and would not be used in any other
states without Mr. Silver's consent; (v) Lucho Marcial and his firm would be the Primary Design
Architects in the event Prime Wellness was awarded a license; and (vi) Mr. Silver would be put
on High Street Capital's health insurance plan.

110.    A few days after his meeting with Mr. Murphy, Mr. Silver met with Mr. Yellin,
who confirmed Mr. Murphy's representations and reassured Mr. Silver that his deal would
shortly be memorialized in a signed contract.

111.    Consistent with his and Mr. Yellin's representations to Mr. Silver, on March 16,
2017, Mr. Murphy sent Mr. Silver a written offer of employment to be the Chief Marketing
Officer of Prime Wellness in the event it was awarded a cannabis license.

112.    In addition, Mr. Silver's name and his employment offer letter was submitted to
the Commonwealth of Pennsylvania in connection with the completed applications, along with
an organizational chart, that reflected Mr. Silver's role in the licensee.

113.    The representations by Messrs. Murphy and Yellin, including their offer to have
Mr. Silver become the licensee's Chief Marketing Officer, were false and fraudulent, because

they had no intention of abiding by them. Instead, Messrs. Murphy and Yellin lied to Mr. Silver to induce him to continue working on the Pennsylvania application.

114.    In reliance on the representations and Messrs. Murphy and Yellin, Mr. Silver continued to work on the Pennsylvania application and, on March 18, updated the Google Doc to reflect the promises that Messrs. Murphy and Yellin had made to him. Because they had shared access to the Google Doc, Messrs. Murphy and Yellin were able to track all the changes that were made in the Google Doc with the link that they were sent.

115.    Neither Mr. Murphy nor Mr. Yellin responded that the changes did not accurately reflect their conversations with Mr. Silver nor did either of them give any indication that they would not sign the revised document.

116.    The Pennsylvania application was due on March 20. Thus, Mr. Silver was working day and night to prepare it.

117.    On March 20, Messrs. Murphy and Yellin finally presented him with a written contract. Mr. Murphy stated that the document contained all the provisions the parties had previously agreed to and flipped to the signature page and asked Mr. Silver to sign it immediately.

118.    Mr. Silver expected Messrs. Murphy and Yellin to present him with the Google Doc that they had regularly shared among themselves. But when he looked at the front page he noticed that it was not the Google Doc that he had previously exchanged with Messrs. Murphy and Yellin. Instead, they presented him with a new document that he had never previously seen.

119.    Due to the upcoming application deadline, Mr. Silver had not left the office in three days and had no time to, and was in no position to, review and revise a new document that he had never previously seen.

120.    Accordingly, Mr. Silver declined to sign the new document and asked Messrs. Murphy and Yellin to simply sign the document that they previously received and accepted without comment on March 18.

121.    Despite their previous oral agreement to the terms reflected in the March 18 document, Messrs. Murphy and Yellin refused to sign it.  Instead, they demanded that the parties return to the agreement they had reached back in December.

122.    Reluctantly, Mr. Silver agreed to sign that version of the document to ensure that he had something signed in writing from Defendants.

123.    Mr. Murphy then grabbed a document from his desk and asserted that it was the December version of the agreement.

124.    Mr. Murphy's statement was a lie. Although the document he presented was formatted to look like the parties' Google Doc, it was actually a document that Mr. Silver had never previously seen, much less reviewed.

125.    At that point, Mr. Silver refused to sign Mr. Murphy's document and explained that Google Docs automatically saves all revisions.  Accordingly, Mr. Silver opened his laptop, went to the Google Doc revision history, and showed Mr. Murphy that revision history.

126.    Mr. Murphy then identified the date of the version that he wanted.  Mr. Silver printed that version and the parties signed it.

127.    Messrs. Murphy and Yellin also left the final drafting and execution of an LLC agreement for Prime Wellness to the last minute.  This document was essential because it was a required part of the application.

128.     Ultimately, Mr. Lenfest agreed to sign a copy of an LLC agreement for Prime Wellness, but only on the condition that it later be revised to reflect the actual terms of the agreement between Mr. Lenfest and High Street Capital.

129.     Mr. Silver completed and submitted the Pennsylvania applications later that evening.

## VIII.   As Soon As Mr. Silver Completes His Work, Defendants Renege On Their Promises To Pay Him

130.     After he completed and submitted the Pennsylvania application, Mr. Silver returned to California to have shoulder surgery.

131.     As Mr. Silver was recovering from the surgery, Defendants asked him to prepare materials related to the Drexel research application, which had advanced to the final round.

132.     During conversations about the additional work, Mr. Lenfest's associate, Christopher Noe, acknowledged that he and Mr. Lenfest knew that Mr. Silver had been promised a 4% equity interest in Prime Wellness in the event it was awarded a license.

133.     Mr. Silver prepared the materials and sent them to Defendants.

134.     Based on his conversations with Defendants, Mr. Silver understood that he would be the project leader for Prime Wellness in the event it was awarded a cannabis license. Accordingly, after preparing the Drexel materials, he turned to Prime Wellness and began outlining a strategy so that the business would be prepared to succeed in the event it was awarded a license.

135.     In mid-April, Mr. Silver e-mailed Defendants with a list of action items to be completed during the quiet period in advance of the announcement of the license winners.

136.    Mr. Yellin responded by instructing Mr. Silver to do nothing until Messrs. Yellin and Murphy contacted him later that week. Messrs. Yellin and Murphy, however, never contacted Mr. Silver.

137.    Around the same time, Mr. Silver learned that, in violation of its promise that Mr. Silver would lead its licensing efforts in Ohio, High Street Capital had hired another individual, Patrick Rutan, to lead their application efforts in Ohio.

138.    Mr. Rutan proceeded to reach out to all of Mr. Silver's contacts in an attempt to get them to work directly with High Street Capital, rather than with Mr. Silver.

139.    In short, as soon as the Defendants got what they wanted from Mr. Silver with respect to the Pennsylvania license application and the Drexel application, they cut off all contact with him, in direct violation of the promises they had made to him.

140.    On June 27, Prime Wellness was awarded a Pennsylvania cannabis cultivation license.

141.    Following Prime Wellness's victory, Mr. Silver contacted Defendants regarding the additional compensation he was due and about his promised role as Chief Marketing Officer of Prime Wellness.

142.    Defendants, through their attorney, informed Mr. Silver that they were not going to perform on any of the promises they had made to him and that he would not be Prime Wellness Chief Marketing Officer.

143.    In light of Defendants' lengthy foot-dragging on signing a contract with Mr. Silver, their last-minute effort to dupe him into signing a written document that he had never previously seen, and their conduct immediately after Mr. Silver completed his work for them, it

is clear that they never had any intention of abiding by any of the promises they made to him. Those promises were false and fraudulent when made.

144.     Upon information and belief, Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC currently own all of the equity interests in Prime Wellness, including the 4% equity interest that rightfully belongs to Mr. Silver.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Defendants H. Chase Lenfest, High Street Capital and Prime Wellness)**

145.     Plaintiffs incorporate by reference all preceding paragraphs.

146.     Plaintiffs entered into an agreement with Defendants H. Chase Lenfest and High Street Capital to prepare Pennsylvania cannabis applications for them and in their capacity as promotors of Defendant Prime Wellness.

147.     Defendant Prime Wellness assumed that contract and received the benefits of it by, among other things, being awarded a cannabis cultivation license based on the applications prepared by Plaintiffs.

148.     Plaintiffs fulfilled their obligations under the contract by preparing and submitting cannabis applications for Defendants.

149.     Plaintiffs' contingent compensation under the contract became due when Defendant Prime Wellness was awarded a cannabis cultivation license.

150.     Defendants H. Chase Lenfest, High Street Capital and Prime Wellness breached their contract with Plaintiffs, and thereby injured them, by failing to pay Plaintiffs their contingent compensation, including, without limitation, the $150,000 cash bonus, 4% non-dilutable equity stake in the licensee and by failing to give Mr. Silver the salaried position of Chief Marketing Officer of the licensee.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  pre- and post-judgment interest; and

      c.  any further relief that the Court's deems just and proper.

**COUNT II**
**PROMISSORY ESTOPPEL**
**(Against H. Chase Lenfest, High Street Capital and Prime Wellness)**

151.    Plaintiffs incorporate by reference all preceding paragraphs.

152.    This Count is pleaded in the alternative in the event it is determined that there was no enforceable contract between Plaintiffs and Defendants.

153.    Defendants Kevin Murphy and Melvin Yellin made a series of promises to Plaintiffs about the contingent consideration they would receive in the event the applications they prepared resulted in Defendants being awarded a cannabis license.

154.    When making the promises, Messrs. Murphy and Yellin were acting in their capacity as agents for Defendants H. Chase Lenfest, High Street Capital and Prime Wellness.

155.    Defendants reasonably expected those promises to induce Plaintiffs to act.

156.    Plaintiffs did in fact rely on those promises when they performed the work necessary to prepare the applications.

157.    Injustice can be avoided only by enforcing the promises.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  pre- and post-judgment interest; and

      c.  any further relief that the Court's deems just and proper.

## COUNT III
## UNJUST ENRICHMENT/QUANTUM MERUIT
### (Against H. Chase Lenfest, High Street Capital and Prime Wellness)

158.  Plaintiffs incorporate by reference all preceding paragraphs.

159.  This Count is pleaded in the alternative in the event it is determined that there was no enforceable contract between Plaintiffs and Defendants.

160.  Plaintiffs conferred a benefit on Defendants H. Chase Lenfest, High Street Capital and Prime Wellness by preparing cannabis license applications on their behalf that ultimately resulted in Prime Wellness obtaining a cannabis license.

161.  Defendants H. Chase Lenfest, High Street Capital and Prime Wellness appreciated this benefit because they knew of the work performed by Plaintiffs.

162.  It would be inequitable to permit Defendants H. Chase Lenfest, High Street Capital and Prime Wellness to retain all of the benefits conferred upon them without properly compensating Plaintiffs for their efforts.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  pre- and post-judgment interest; and

      c.  any further relief that the Court's deems just and proper.

## COUNT IV
## COMMON LAW FRAUD
### (Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)

163.  Plaintiffs incorporate by reference all preceding paragraphs.

164.  Defendants Kevin Murphy and Melvin Yellin made material factual representations to Plaintiffs by repeatedly promising to pay them contingent compensation and to

make Mr. Silver the licensee's Chief Marketing Officer in the event Defendants were awarded a cannabis license, even though Defendants had no intention of ever keeping those promises.

165.     Defendants Kevin Murphy and Melvin Yellin specifically intended Plaintiffs to rely on those false statements and Plaintiffs did, in fact, justifiably rely on those statements.

166.     The false statements of Messrs. Murphy and Yellin injured Plaintiffs by inducing them to perform work for which they have not been fully and properly compensated.

167.     In making the false statements, Messrs. Murphy and Yellin acted as the agents of Defendants H. Chase Lenfest, High Street Capital and Prime Wellness.  Accordingly, Defendants H. Chase Lenfest, High Street Capital and Prime Wellness are vicariously liable for those false statements.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  punitive damages;

      c.  pre- and post-judgment interest; and

      d.  any further relief that the Court's deems just and proper.

## COUNT V
## SECURITIES FRAUD
### (Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)

168.     Plaintiffs incorporate by reference all preceding paragraphs.

169.     Membership interest in Prime Wellness, a manager-managed LLC, are securities covered by Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

170.     Defendants Kevin Murphy and Melvin Yellin made material factual representations to Plaintiffs by repeatedly promising to pay them contingent compensation,

including membership interests in Prime Wellness, even though Defendants had no intention of ever keeping those promises. Thus, the fraudulent statements of Messrs. Murphy and Yellin were made in connection with the purchase or sale of securities.

171.    Defendants Kevin Murphy and Melvin Yellin specifically intended Plaintiffs to rely on those false statements and Plaintiffs did, in fact, rely on those statements.

172.    The false statements of Messrs. Murphy and Yellin caused Plaintiffs to suffer damages by inducing them to perform work for which they have not been fully and properly compensated.

173.    In making the false statements, Messrs. Murphy and Yellin acted as the agents of Defendants H. Chase Lenfest, High Street Capital and Prime Wellness. Accordingly, Defendants H. Chase Lenfest, High Street Capital and Prime Wellness are vicariously liable for those false statements.

WHEREFORE, Plaintiffs seek a judgment awarding them

        a.  compensatory damages in an amount to be proved at trial;

        b.  pre- and post-judgment interest; and

        c.  any further relief that the Court's deems just and proper.

## COUNT VI
### CIVIL CONSPIRACY
#### (Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)

174.    Plaintiffs incorporate by reference all preceding paragraphs.

175.    Defendants H. Chase Lenfest, Kevin Murphy and Melvin Yellin agreed to induce Plaintiffs to prepare cannabis applications for them on the false promise that they would receive additional consideration in the event the applications resulted in the award of a cannabis license.

176.    Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin and their agents engaged in numerous overt acts in furtherance of the conspiracy, including repeatedly and falsely promising Plaintiffs that they would receive the contingent consideration to which the parties had agreed and repeatedly urging Plaintiffs to continue their work on the applications.

177.    The conspiracy resulted in actual legal damage to Plaintiffs by inducing them to to perform work for which they have not been fully and properly compensated.

178.    Defendants High Street Capital and Prime Wellness are vicariously liable for the conspiracy entered into by Messrs. Lenfest, Murphy and Yellin.

WHEREFORE, Plaintiffs seek a judgment awarding them

a.  compensatory damages in an amount to be proved at trial;

b.  punitive damages;

c.  pre- and post-judgment interest; and

d.  any further relief that the Court's deems just and proper.

## COUNT VII
## UNJUST ENRICHMENT
### (Against Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC)

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    Plaintiffs conferred a benefit on Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC by causing the LLC of which they are the sole members, Prime Wellness, to be awarded a cannabis license.

181.    Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC knew appreciated the benefit because their officers and members had personal knowledge of the work performed by Plaintiffs in connection with the license applications.

182.    Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC have retained property, namely a 4% non-dilutable equity stake in Prime Wellness, that properly belongs to Plaintiffs and it would be inequitable to permit them to retain that property.

WHEREFORE, Plaintiffs seek a judgment awarding them

> a. compensatory damages in an amount to be proved at trial;
>
> b. pre- and post-judgment interest; and
>
> c. any further relief that the Court's deems just and proper.

### **Jury Demand**

Plaintiffs request a jury trial on all issues so triable.

Respectfully submitted,

Peter J. Kreher
Kreher & Trapani LLP
1325 Spruce St.
Philadelphia, PA  19107
Phone:  (215) 907-7288
Fax:  (215) 907-7287
pete@krehertrapani.com

*Attorney for Plaintiffs Harris Silver
and Entity X, LLC*

## VERIFICATION

I, Harris Silver, a citizen of the United States and the State of California, have read the foregoing Verified Complaint and declare under penalty of perjury under the laws of the United States that the foregoing facts are correct and true to the best of my knowledge and belief.

Dated: December 14, 2017

Harris Silver