## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **HARRIS SILVER and ENTITY X, LLC** <br> 245 6th Avenue Suite #1 <br> Venice, CA 90291 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 18-cv-20-JP |
| | : | |
| **HAROLD CHASE LENFEST** <br> 1100 Ginkgo Lane <br> Gladwyne, PA 19035 | : | |
| | : | |
| **KEVIN MURPHY** <br> 322 West 57th Street, Apt. 48H <br> New York, NY 10019 | : | **AMENDED COMPLAINT** |
| | : | |
| **MELVIN YELLIN** <br> 1136 Fifth Avenue <br> New York, NY 10028 | : | |
| | : | **JURY TRIAL DEMANDED** |
| **HIGH STREET CAPITAL PARTNERS MANAGEMENT, LLC** <br> 366 Madison Avenue, 11th Floor <br> New York, NY 10017 | : | |
| | : | |
| **HIGH STREET CAPITAL PARTNERS, LLC** <br> d/b/a **ACREAGE HOLDINGS** <br> 366 Madison Avenue, 11th Floor <br> New York, NY 10017 | : | |
| | : | |
| **PRIME WELLNESS OF PENNSYLVANIA, LLC** <br> 210 Wyoming Avenue <br> Scranton, PA 18503 | : | |
| | : | |
| **HCL MM INVESTMENTS PA, LLC** <br> 565 E. Swedesford Road, Suite 303 <br> Wayne, PA 19087 | : | |
| | : | |
| Defendants. | : | |

## INTRODUCTION

1.     This case arises out of the Defendants' fraudulent scheme to dupe Plaintiff Harris Silver into helping them obtain a cannabis license from Pennsylvania and then cheat Mr. Silver out of the compensation they had agreed to pay him.

2.     The High Street Capital Defendants purport to be successful investors in the fast-growing field of licensed cannabis cultivation and dispensing and are seeking to cash in via an initial public offering of securities in the cannabis-related businesses they own.

3.     In actuality, the High Street Capital Defendants have suffered a string of failures in their efforts to actually obtain the cannabis licenses they sought.  For example, the High Street Capital Defendants applied for, but failed to obtain, cultivation licenses in Massachusetts, Connecticut, Illinois, New York, and Maryland.

4.     Following their repeated failures, the High Street Capital Defendants realized that they lacked the necessary expertise to obtain cannabis licenses on their own.

5.     Accordingly, the High Street Capital Defendants sought help from Harris Silver, who has extensive experience with cannabis licensing issues and was instrumental in obtaining cannabis licenses in Connecticut and Illinois, *i.e.*, some of the same licenses that the High Street Capital Defendants were unable to win on their own.

6.     The High Street Capital Defendants used Mr. Silver's services in three ways: (i) first, they relied on and invoked his expertise to convince Defendant H. Chase Lenfest to enter into a joint venture with them to pursue cannabis licenses in Pennsylvania; (ii) second, the High Street Capital Defendants and Mr. Lenfest then relied on Mr. Silver to quarterback their efforts to actually obtain those licenses; and (iii) third, they used his network of subject matter experts and professionals.

7.      In return for Mr. Silver's extensive work, Defendants agreed to compensate Mr. Silver as follows:  (i) $180,000 to prepare their cultivation and dispensary applications, and (ii) in the event they were awarded a cultivation license, a $150,000 cash bonus, a 4% non-dilutable equity stake in any licensee and an ongoing position as Chief Marketing Officer of the licensee.

8.      After months of intensive effort, Mr. Silver prepared an exemplary application for the Defendants, and they were ultimately awarded a cannabis cultivation license in Pennsylvania.

9.      At that point, Mr. Silver should have received his cash bonus and equity stake and been hired as the licensee's Chief Marketing Officer.   But despite numerous requests, Mr. Silver has received neither his cash bonus nor his equity stake nor been offered employment as the licensee's Chief Marketing Officer.

10.      Defendants' refusal to abide by their agreement with Mr. Silver amounts to a breach of contract by all of them, for which they are all jointly and severally liable.

11.      As will be more thoroughly described, the Defendants' misconduct also amounts to fraud, because it is clear from their words and conduct that they never intended to abide by the promises they made to Mr. Silver.  Instead, they only used him to obtain a license without ever having any intention of properly compensating him for his efforts.

12.      Accordingly, Mr. Silver brings this lawsuit to recover the compensation that he was promised, which he relied upon to his detriment as he performed extensive work for the Defendants.

## THE PARTIES

### Harris Silver and Entity X, LLC

13.      Plaintiff Harris Silver is a U.S. citizen who permanently resides in Los Angeles, California.  Accordingly, he is a citizen of the State of California.

3

14.     Plaintiff Entity X, LLC is a single-member limited liability company whose sole member is Harris Silver.  Accordingly, Entity X, LLC is a citizen of the State of California.

**The High Street Capital Defendants**

15.     Upon information and belief, Defendant Kevin Murphy is the Managing Partner of Defendant High Street Capital Partners Management, LLC and a member of Defendant High Street Capital Partners, LLC.  Accordingly, any conduct by Mr. Murphy in the course of his employment is imputed to Defendant High Street Capital Partners Management, LLC and Defendant High Street Capital Partners, LLC as a matter of law.

16.     Upon information and belief, Mr. Murphy is a U.S. citizen who permanently resides in the State of New York.  Accordingly, Mr. Murphy is a citizen of the State of New York.

17.     Upon information and belief, Defendant Melvin Yellin is employed by and is a member of Defendant High Street Capital Partners Management, LLC and the Managing Director of Defendant High Street Capital Partners, LLC.  Accordingly, any conduct by Mr. Yellin in the course of his employment is imputed to Defendants High Street Capital Partners Management, LLC and High Street Capital Partners, LLC as a matter of law.

18.     Upon information and belief, Mr. Yellin is a U.S. citizen who permanently resides in the State of New York.  Accordingly, Mr. Yellin is a citizen of the State of New York.

19.     Upon information and belief, Defendant High Street Capital Partners Management, LLC is a Delaware limited liability company that is headquartered in New York, New York and is the Managing Member of Defendant High Street Capital Partners, LLC. Accordingly, any conduct by Defendant High Street Capital Partners Management, LLC or any of its managers, members or agents acting with the scope of its authority as Managing Member

of Defendant High Street Capital Partners, LLC is imputed to Defendants High Street Capital

Partners, LLC as a matter of law.

20.     Upon information and belief, all of the members of Defendant High Street Capital

Partners Management, LLC are U.S. citizens who permanently reside in the State of New York.

Accordingly, Defendant High Street Capital Partners Management, LLC is a citizen of the State

of New York.

21.     Upon information and belief, Defendant High Street Capital Partners, LLC is a

Delaware limited liability company that is headquartered in New York, New York and is a

member of and the Manager of Defendant Prime Wellness of Pennsylvania, LLC.

22.     Upon information and belief, all of the members of Defendant High Street Capital

Partners, LLC are citizens of the State of New York.  Accordingly, Defendant High Street

Capital Partners, LLC is a citizen of the State of New York.

23.     Defendant High Street Capital Partners, LLC is now doing business under the

trade name "Acreage Holdings."

24.     This Complaint refers to Defendants Kevin Murphy, Melvin Yellin, High Street

Capital Partners Management, LLC, and High Street Capital Partners, LLC collectively as the

"High Street Capital Defendants" or "High Street Capital."

25.     This Court may exercise personal jurisdiction over the High Street Capital

Defendants because this case arises out of conduct by the High Street Capital Defendants that

occurred within Pennsylvania and conduct that was specifically directed to Pennsylvania.  More

specifically, all of the actions and omissions giving rise to these claims centered upon the

Defendants' collective efforts to obtain cannabis licenses in the Commonwealth of Pennsylvania.

**Lenfest Parties**

26.     Upon information and belief, Defendant Harold Chase Lenfest is a U.S. citizen who resides in Montgomery County, Pennsylvania.  Accordingly, Mr. Lenfest is a citizen of the State of Pennsylvania and is subject to general personal jurisdiction in this state.

27.     Upon information and belief, Defendant HCL MM Investments PA, LLC is a limited liability company that is headquartered in Wayne, Pennsylvania.  Accordingly, HCL MM Investments PA, LLC is subject to general personal jurisdiction in this state.

28.     Upon information and belief, all of the members of HCL MM Investments PA, LLC are citizens of the State of Pennsylvania.  Accordingly, HCL MM Investments PA, LLC is a citizen of the State of Pennsylvania.

29.     This Complaint refers to Defendants Harold Chase Lenfest and HCL MM Investments PA, LLC collectively as the "Lenfest Parties."

**Prime Wellness of Pennsylvania**

30.     Defendant Prime Wellness of Pennsylvania, LLC ("Prime Wellness") is headquartered in and has its principal place of business in Berks County, Pennsylvania. Accordingly, Prime Wellness is subject to general personal jurisdiction in Pennsylvania.

31.     Prime Wellness holds a cannabis cultivation and processing license from the Commonwealth of Pennsylvania.

32.     The members of Prime Wellness are Defendant High Street Capital Partners, LLC and HCL MM Investments PA, LLC.  Accordingly, Prime Wellness LLC is a citizen of the States of New York and Pennsylvania.

## SUBJECT MATTER JURISDICTION AND VENUE

33.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the federal securities law claim in this lawsuit (Count V) and supplemental jurisdiction under 28 U.S.C. § 1367(a) over all of the state law claims because they form part of the same case or controversy as the federal securities claim.

34.     Pursuant to 28 U.S.C. § 1332, this Court also has diversity jurisdiction over this lawsuit because there is complete diversity and the amount in controversy is in excess of $75,000.

35.     Plaintiffs are citizens of California, and the Defendants are citizens of Pennsylvania and New York.  Accordingly, there is complete diversity.

36.     Defendants have wrongly refused to pay Plaintiffs, among other things, a $150,000 cash bonus and a 4% equity stake in the cannabis licensee.  The 4% equity stake is worth considerably more than $1 million.  Accordingly, the amount in controversy is far in excess of $75,000.

37.     Venue lies in this District because all of the Defendants are inhabitants of this District or transact business here, *see* 15 U.S.C. § 78aa, at least one act or transaction constituting the securities fraud violation occurred in this District, *see id.*, and a substantial part of the events or omissions giving rise to the claims occurred in this District, *see* 28 U.S.C. § 1391(b)(2).

## FACTS

I.      **The Cannabis Industry**

38.     Over the last several years, many states have legalized the cultivation, processing and dispensing of cannabis products in certain circumstances.

39.     Typically, an entity must apply for and obtain one of a very limited number of licenses from a state in order to lawfully cultivate, process or dispense cannabis products in that state.

40.     Because states typically award very few licenses, they are highly valuable, and the process to win one is highly competitive.

41.     To put together a strong application, an applicant must compile a detailed and comprehensive plan that covers numerous topics, including facility design, security, compliance with state regulations and the applicant's ability to fund the startup of the business and properly manage its operations.

## II.     Harris Silver Helps Obtain Cannabis Licenses That High Street Capital Fails To Win

42.     High Street Capital is a New York investment firm founded, led and controlled by Defendants Kevin Murphy and Melvin Yellin.

43.     In its marketing materials, High Street Capital claims to be a "leader within the emerging medical cannabis industry" that "possesses a broad understanding of the medical cannabis space including knowledge and experience operating businesses within strict regulatory environments."

44.     But in fact, time and time again, High Street Capital has failed to win licenses in several states because it actually lacks the expertise necessary to successfully prepare and submit winning applications.

45.     In addition, High Street Capital lacks the expertise to successfully operate cannabis businesses in heavily regulated environments.

46.     For example, in 2013, High Street Capital sought a cannabis cultivation license in Connecticut but failed to obtain one.

8

47.     Similarly, in 2014, High Street Capital failed to win a cannabis cultivation license in Illinois.

48.     Meanwhile, Harris Silver led applications that actually won the cultivation licenses in Connecticut and Illinois that High Street Capital coveted but failed to win.

49.     Mr. Silver has extensive experience and connections in the cannabis industry.

50.     For example, Mr. Silver has a Master of Arts in Architecture and has been at the forefront of developing energy-efficient building systems for the cannabis industry.  Indeed, teams that he has led have spent hundreds of hours in design research that have led to state-of-the-art and industry-leading energy-efficient designs.

51.     In addition, Mr. Silver has extensive experience in advertising and branding and has led the development of advanced medical cannabis products, with an emphasis on formulation consistency and dose-controlled pharmaceutical packaging.

52.     Mr. Silver has also been a leader in developing clear and concise labeling and child-safe packaging across the entire family of cannabis products.

53.     Mr. Silver has used his extensive experience, knowledge and skills to lead successful cannabis licensing applications in several states.

54.     For instance, the successful application that he quarterbacked in Connecticut was the highest scoring application in the state.

55.     Similarly, the application Mr. Silver led and submitted in Illinois was the highest scoring application in its district.

**III.    High Street Capital Knows It Cannot Beat Mr. Silver, So It Purports To Invite Him To Join As A Partner**

56.     After being defeated by Mr. Silver's applications in Connecticut and Illinois and failing to win in all of their other attempts to be awarded cultivation licenses, High Street Capital

realized it needed Mr. Silver's expertise and would profit substantially by eliminating him as competitor and working with him.

57.     In addition, High Street Capital was hoping to conduct an initial public offering ("IPO") of equity in its cannabis business.  To bolster the value of its cannabis business, High Street Capital wanted to show investors that it could win the types of competitive license application processes that Mr. Silver had shown he could win.

58.     Accordingly, in the summer of 2016, High Street Capital and Mr. Silver began discussing whether they should work together on future applications.

59.     By early fall 2016, the talks had progressed to the point that High Street Capital and Mr. Silver discussed the terms by which he would join High Street Capital as a partner and, in that capacity, lead all of its future license applications.

60.     But Mr. Silver advised High Street Capital that he had offers to work with other cannabis companies and thus could not wait forever to finalize a deal with them.  For example, on September 7, 2016, Mr. Silver texted Mr. Murphy and advised him that he had "just got a call from a qualified group that wants to hire me to work on applications."

61.     Wary of losing Mr. Silver to a competitor, Mr. Murphy texted back on September 9 to assure Mr. Silver that High Street Capital wanted to work with him in Pennsylvania and confirmed the relationship would extend to other states.  Specifically, Mr. Murphy texted:  "We will do Pennsylvania together.  I'm also thinking about Michigan."

**IV.     High Street Capital Uses Mr. Silver To Obtain A Partnership With Chase Lenfest**

62.     While Mr. Silver's partnership discussions with High Street Capital were ongoing, Kevin Murphy and Melvin Yellin of High Street Capital asked Mr. Silver to

accompany High Street Capital representatives to a meeting in Philadelphia with Defendant H. Chase Lenfest on November 2, 2016.

63.     The purpose of the meeting was to convince Mr. Lenfest to join High Street Capital's efforts to obtain Pennsylvania cannabis licenses.

64.     High Street Capital sought Mr. Lenfest's involvement because (i) the Lenfest name carries great weight in Pennsylvania; (ii) they could use Mr. Lenfest's numerous charitable activities to bolster their application; and (iii) Mr. Lenfest's great wealth and connections could provide the capital necessary to fund the startup of the business in the event they were awarded a license.

65.     Although Mr. Silver did not have a final agreement to join High Street Capital, he agreed to go to the meeting with Mr. Lenfest on the understanding that his deal would be finalized in short order.

66.     Mr. Silver spent several days preparing for the meeting, including preparing a binder of materials to be shared with Mr. Lenfest.  Those materials included, among other things, samples of cannabis products, information about the cannabis facility that Mr. Silver had designed and built for his Illinois application and a detailed diagram of all of the steps necessary to prepare a high-quality application.

67.     No one from High Street Capital provided any input into those materials or even bothered to review them prior to the meeting.

68.     The meeting occurred at Mr. Lenfest's apartment in downtown Philadelphia.

69.     In addition to Mr. Silver, Kevin Murphy and Chris Tolford attended the meeting for High Street Capital.  Mr. Lenfest also personally attended the meeting, along with his advisors Christopher Noe and Thomas Pasch.

70.     After introductory remarks by Mr. Murphy, he turned the meeting over to Mr. Silver, who presented the detailed materials that he had prepared.

71.     Mr. Silver's presentation immediately sparked the interest of Mr. Lenfest and his associates.

72.     For example, Mr. Noe explained that Mr. Lenfest and his team had already met with many others who wanted to partner with Mr. Lenfest on a cannabis application, but Mr. Silver's presentation was the first time that anyone had provided a roadmap for how to actually prepare a successful application.

73.     In addition, Mr. Silver was the first person who had shown that he had the necessary real world experience to actually win a competitive application process.

74.     On November 4, Mr. Noe confirmed in writing how impressed he was with Mr. Silver's presentation and advised that Mr. Lenfest was leaning towards partnering with High Street Capital.

75.     Shortly thereafter, Mr. Lenfest and High Street Capital did in fact agree to jointly pursue cannabis application licenses in Pennsylvania.

76.     Although the joint venture commenced and proceeded, Mr. Lenfest did not fully negotiate or sign any documents regarding how his interest in the application licensee would be structured until March 2017.

77.     Rather, from November 2016 to March 2017, Mr. Lenfest and High Street Capital had only a common law partnership through which they conducted their efforts to obtain Pennsylvania cannabis licenses, including the promises discussed below that they made to Mr. Silver.

**V.    After Mr. Silver Performs Substantial Work To The Benefit Of The Defendants, High Street Capital Repudiates Its Promise Of A Partnership With Mr. Silver**

78.    As late as November 5, 2016, High Street Capital continued to represent to Mr. Silver that it would bring him in as a partner to lead all of its cannabis application efforts nationwide.

79.    Indeed, on November 5, Kevin Murphy emailed to Mr. Silver a photograph diagramming the High Street Capital division that Mr. Silver would lead and demonstrating how he would share in the profits of all of High Street Capital's businesses.  Mr. Murphy's e-mail containing the photograph is attached hereto as Exhibit 1.

80.    But once it appeared that Mr. Silver had successfully brought Mr. Lenfest on board, High Street Capital immediately backed away from its promise to bring Mr. Silver on as a full partner.

81.    Instead, after Mr. Silver had performed countless hours of work on behalf of the Defendants, on or about November 6 or 7, 2016, High Street Capital proposed that any agreement with Mr. Silver be limited to the Pennsylvania application process.  According to High Street Capital, if Mr. Silver demonstrated his ability to put together a strong application, then it would revisit a broader partnership relationship with him.

82.    Mr. Silver was greatly disappointed by High Street Capital's about-face, but continued to believe that High Street Capital would act in good faith toward him.  Additionally, at that point, Mr. Silver had declined other engagements based upon the representations of remuneration from the Defendants.

83.    Accordingly, Mr. Silver attempted to mitigate his losses and agreed to the more limited relationship that Mr. Murphy requested.

84.     Mr. Murphy asked Mr. Silver to put in writing the terms of his compensation for working on the Pennsylvania applications.

85.     Accordingly, on or about November 7, 2016, Mr. Silver drafted a set of terms on a Google document which he e-mailed to Mr. Murphy and to which he granted Messrs. Murphy and Yellin access to view and edit online via Google docs.

86.     The November 7 term sheet is attached hereto as Exhibit 2.

87.     Among other things, the November 7 term sheet called for Mr. Silver to receive $200,000 to complete the cultivation license applications, $50,000 to complete the dispensary license applications and a "non-dilutable" 5% ownership stake in any entities awarded a cultivation or dispensary license.

88.     On November 8, Mr. Silver texted Mr. Murphy to inquire about the status of the wire transfer called for by the November 7 term sheet.

89.     That same day, Mr. Murphy responded via text and urged Mr. Silver to start working without the wire:

> "I'm currently dealing with a tough situation in Florida.  I'm trying to close up additional ownership before the election results tonight. ***I think you can get to work and be assured you will be paid.  You don't have to wait for wire to initiate the work.***  Let's get started. We all have an appreciation for what each of us has on their plate. Thank you buddy."  (emphasis added)

90.     Mr. Murphy's November 8 text is attached hereto as Exhibit 3.

91.     Mr. Silver, however, wanted an unequivocal agreement from the Defendants that was confirmed by a wire of the initial funds.

92.     To move the ball forward, Mr. Silver traveled at his own expense to a conference in Las Vegas in mid-November to meet with Mr. Murphy in person.  At that conference, Mr.

Murphy assured Mr. Silver that Mr. Lenfest had agreed to work with High Street Capital and that they and Mr. Silver would all work together.

93.     During their conversations in Las Vegas and in follow up conversations and texts, Mr. Murphy assured Mr. Silver that he would receive an equity stake in the Pennsylvania licensee if it successfully won a license.

94.     During a phone call on or about December 9, 2016, Mr. Murphy agreed to pay Mr. Silver, among other things, $180,000 to prepare the applications, a $150,000 bonus for each cultivation license win, a 5% non-dilutable equity stake in any successful licensee and an ongoing position as the Chief Marketing Officer of the licensee.

95.     That same day, Mr. Silver sent Mr. Murphy an e-mail to "memorialize what [they] agreed to on the phone."  The e-mail lists each of the terms described above.

96.     Mr. Silver's December 9, 2016 e-mail is attached hereto as Exhibit 4.

97.     High Street Capital asked Mr. Silver to update the November 7 Google document to reflect the revised terms to which Mr. Murphy had agreed, and Mr. Silver did so at approximately 4:45 pm eastern time on December 12.

98.     The changes were immediately shared with High Street Capital, which had shared access to the Google document.

99.     The December 12 term sheet that was shared with High Street Capital at approximately 4:45pm eastern time on December 12 is attached hereto as Exhibit 5.

100.     Approximately 90 minutes later, at 6:10pm eastern time on December 12, Mr. Murphy e-mailed Mr. Silver and asked whether Mr. Silver would accept "4% post the major money raise, i.e.:  no dilution as we only anticipate raising money once."

101.    Mr. Murphy's December 12, 2016 e-mail to Mr. Silver is attached hereto as Exhibit 6.

102.    At 7:11pm eastern time that same day, December 12, Mr. Silver responded:  "I thought we had agreed to 5% . . . I don't want us stuck on this . . . can you meet half-way on this and do 4.5%?"

103.    Mr. Silver's December 12, 2016 e-mail to Mr. Murphy is attached hereto as Exhibit 7.

104.    At 8:36am the next morning, December 13, Mr. Murphy responded to Mr. Silver via text as follows:

> "*4% is the minimum*.  It could go up from there.  I just have to account for a handful of others that I don't know at the moment." (emphasis added)

105.    Mr. Murphy's December 13 text message is attached hereto as Exhibit 8.

106.    After receiving Mr. Murphy's text, Mr. Silver spoke via telephone with Mr. Yellin.

107.    During that call with Mr. Yellin, Mr. Silver agreed to Mr. Murphy's request that he accept a 4% non-dilutable equity stake in any licensee.  With that meeting of the minds, the parties had agreed upon all of the material terms upon which Mr. Silver would agree to prepare Pennsylvania cannabis cultivation and dispensary applications for Mr. Lenfest and High Street Capital.

108.    During that call, Mr. Yellin confirmed to Mr. Silver that he would reduce the parties' agreement to a writing by January 15, 2017.

109.    Mr. Lenfest and the High Street Capital Defendants agreed that the proposed licensee on the applications that Mr. Silver would prepare would be Prime Wellness.

110.    But at that time, as discussed above, Mr. Lenfest had not negotiated or signed any contracts governing his interests in the licensee and Prime Wellness's LLC agreement had not even been drafted.  In addition, Prime Wellness itself had no bank accounts, assets or employees of its own.  In effect, Prime Wellness did not exist and could not itself pay Mr. Silver.

111.    Thus, in addition to Prime Wellness itself being obligated to pay Mr. Silver, High Street Capital and Mr. Lenfest were also responsible for paying him because they, or their agents, were the ones who made the promises to Mr. Silver and entered into the agreements with him, they were the ones who would benefit personally from the work he did, and they were the promotors of Prime Wellness.

112.    Thus, throughout the various negotiations discussed above and below, Messrs. Murphy and Yellin acted as the agents of High Street Capital, Prime Wellness and Mr. Lenfest.

## VI.    Mr. Silver Receives An Initial Payment And Immediately Begins Working For High Street Capital And Mr. Lenfest

113.    Following the meeting of the minds on Mr. Silver's 4% non-dilutable equity stake, High Street Capital promptly wired Mr. Silver an initial payment of $90,000.

114.    Combined with the express agreement of Mr. Yellin following the detailed negotiations discussed above on Mr. Silver's equity stake, High Street Capital's wiring of the money to Mr. Silver constituted an unequivocal agreement by them to the terms to which the parties had orally agreed, which included a $180,000 fee to Mr. Silver to prepare the applications, a $150,000 cash bonus in the event the Defendants won a cultivation license, a 4% non-dilutable equity stake in any licensee and an ongoing position as Chief Marketing Officer of the licensee.

115.    Upon receiving the wire, Mr. Silver began working for Mr. Lenfest and High Street Capital.

116.    Notably, however, High Street Capital and Mr. Lenfest did not ask Mr. Silver to begin working on the Pennsylvania cultivation and dispensary applications.  Instead, Mr. Silver was asked to immediately prepare a proposal that Mr. Lenfest wanted to submit to Drexel University for the purposes of convincing Drexel to partner with the Defendants in their pursuit of what is known as a Pennsylvania "clinical registrant" or "CR" cannabis license.

117.    Pennsylvania's Medical Marijuana Act (the "Act") provides for special CR licenses that allow CR licensees to both grow and sell cannabis products with fewer restrictions than cultivation or dispensary licensees.  Thus, a CR license is a highly lucrative opportunity.

118.    The Act requires applicants for a CR license to partner with a Pennsylvania "academic clinical research center" or ACRC.  Drexel University's medical school is one of the very few Pennsylvania ACRCs.

119.    Unbeknownst to Mr. Silver, Mr. Lenfest had missed Drexel's deadline for submitting a response to the request for information ("RFI") that it had sent to several potential partners.

120.    Drexel agreed to extend its RFI deadline for Mr. Lenfest, who shared the opportunity with his new partners at High Street Capital.

121.    Mr. Silver promptly set to work on the Drexel RFI response and worked very closely with Mr. Lenfest's associates, including Mr. Noe, to complete it.  Specifically, Mr. Silver devoted all of his time and worked around the clock to complete the RFI response, which was submitted on time.

122.    As a result of Mr. Silver's work on the Drexel RFI response, Drexel selected Mr. Lenfest and High Street Capital as one of four finalists.  As we discuss below, as a result of

additional work by Mr. Silver, Drexel ultimately selected Prime Wellness as the only cannabis company with which it would partner for the purposes of seeking a CR license in Pennsylvania.

123.   Mr. Silver only agreed to do any work on the Drexel RFI response -- and later to prepare the Pennsylvania cultivation and dispensary license applications -- because of High Street Capital's unequivocal agreement to compensate him with, among other things, a $150,000 cash bonus for winning a cultivation license, a 4% equity stake in any licensee and an ongoing position as Chief Marketing Officer of the licensee.

## VII.   Mr. Silver Takes Charge Of The Pennsylvania Application

124.   After he completed the Drexel RFI response, Mr. Silver turned his attention to the Pennsylvania cultivation and dispensary applications.

125.   In January 2017, at High Street Capital's request, Mr. Silver temporarily moved to New York to work out of High Street Capital's offices there, so that he would be close to the High Street Capital team that he had been told would support his efforts to prepare the applications.

126.   Upon Mr. Silver's arrival in New York, it immediately became clear to him that High Street Capital's Pennsylvania application process was in disarray.  In particular, High Street Capital's personnel were focused on the planned IPO and on its other cannabis businesses, which were performing poorly.  Also, the resources and the team that Mr. Silver was told he would have to help him with the application were non-existent.

127.   In addition, it was apparent that High Street Capital simply did not know how to put together a successful application, because even the most basic decisions had not been made.

128.   For example, given High Street Capital's purported experience in the cannabis industry, Mr. Silver expected that the CEO, COO, CFO, Cultivators and Extractors for the

proposed licensee would already be in place and contributing to the application.  But in fact, there was no team.

129.    Similarly, an essential aspect of the application process required a prospective licensee to show control over appropriate real estate for its cultivation facility.  But, once again, High Street had not lined up any real estate and had done no analyses on where the business should be located.

130.    High Street Capital has also failed to line up appropriate consulting experts. Many parts of the application require consulting with subject-matter experts in fields like horticulture.  Given High Street Capital's purported experience in the industry, Mr. Silver was told that High Street Capital had in-house experience on these matters and an available network of potential experts.

131.    But High Street Capital in fact had no internal expertise nor any external network that Mr. Silver could use.

132.    Indeed, High Street Capital ultimately failed to locate or provide any subject matter experts that could actually be used to support the application.  Instead, the few experts that High Street Capital recommended missed multiple deadlines and ultimately never contributed one word to the application.

133.    In short, High Street Capital had done essentially nothing to get the application process started and lacked the knowledge or expertise to do so.  Accordingly, Mr. Silver had to take control of the entire process immediately and work day and night to produce a high quality application.

134.    Over the next several months, Mr. Silver devoted all of this time and effort to getting the application ready.  In addition to overseeing the entire process, he:

- led the design of the energy-efficient building systems to grow and process cannabis, including hiring, briefing and working with the architects;

- designed the dispensaries to sell the cannabis products;

- led the branding efforts, including hiring, briefing and working with an outside branding agency;

- modified an existing trademarked brand of products that he had previously developed to be used in Pennsylvania;

- located appropriate real estate for a cannabis cultivation facility and negotiated lease options and sales contracts related to that real estate;

- identified and recruited the members of the executive team of the prospective licensee;

- located all of the subject matter experts necessary to complete the application; and

- assumed personal responsibility for nearly every word and image in the application, and personally wrote the application almost in its entirety.

## VII. While Mr. Silver Devoted His Efforts To the Application In Reliance Upon The Terms That Had Been Discussed And Accepted, Defendants Dragged Their Feet On Executing A Written Contract With Him

135.    While Mr. Silver worked around the clock in January, February and into March to prepare the Pennsylvania applications, he remained without a signed writing memorializing the agreement he had made with Messrs. Murphy and Yellin in December.

136.    In his regular emails to, among others, Messrs. Murphy, Yellin, Lenfest and Noe updating them on the status of the application, Mr. Silver reminded them that his agreement should be memorialized in a signed document.

137.    Defendants, however, continually dragged their feet on memorializing their promises to Mr. Silver in writing because, according to them, they were simply too busy but would get to it.  These false promises and reassurances were specifically designed to induce Mr. Silver to continue working on the application, even though Defendants had no intention of paying him what they had promised.

21

138.     From January though early March, Mr. Murphy was regularly away from High Street Capital offices due to vacations, business travel and medical issues.  In addition, during that period, he was focused on other issues, such as preparing for High Street Capital's hoped for IPO.  As a result, Mr. Murphy and Mr. Silver had few, if any, face-to-face meetings during this period.

139.     On March 11, Messrs. Silver and Murphy agreed to meet to catch up.

140.     Mr. Murphy began the March 11 meeting by praising Mr. Silver's efforts on the Pennsylvania applications and then explained that he wanted Mr. Silver to continue to be involved with High Street Capital's efforts in other states after the Pennsylvania applications were completed.

141.     In addition, Mr. Murphy made clear that he highly valued the work that Mr. Silver had prepared for the Pennsylvania applications and wanted to use it in other states in which High Street Capital was operating or might operate in the future.

142.     Because the parties' December agreement was limited to Pennsylvania only at High Street Capital's insistence, Mr. Silver and Mr. Murphy discussed the terms on which Mr. Silver would (i) permit High Street to use his work outside of Pennsylvania, and (ii) Mr. Silver's role in those efforts.

143.     During the meeting, Messrs. Silver and Murphy agreed that, among other things, High Street Capital could use in other states the branded products that Mr. Silver had developed so long as Mr. Silver retained a leadership role in the development of those products and a financial interest in the sale of them.

144.    Mr. Murphy also confirmed that High Street Capital would not use the work Mr. Silver had created for the Pennsylvania applications in any other states without Mr. Silver's involvement.

145.    As discussed above, Mr. Yellin, a licensed attorney, was supposed to reduce the parties' oral agreements into a writing to be signed.  Accordingly, on or about March 15, Mr. Silver met with Mr. Yellin to advise him of the agreement he had reached with Mr. Murphy regarding the use of Mr. Silver's work outside of Pennsylvania.  Mr. Yellin confirmed Mr. Silver's understanding of the parties' agreement.

146.    Mr. Yellin asked Mr. Silver to update the old December term sheet to reflect the additional terms related to the use of Mr. Silver's work outside of Pennsylvania and he did so.

147.    On or about March 16, Mr. Silver signed an agreement related to the ongoing role as Chief Marketing Officer that Defendants ha promised him (the "CMO Agreement").

148.    The CMO Agreement is attached hereto as Exhibit 9.

149.    The parties understood that the Defendants might win either a cultivation license, a dispensary license or both, and that the scope of the Chief Marketing Officer's duties – and thus an appropriate salary for the position – could vary depending which licenses the Defendants won.

150.    Accordingly, the CMO Agreement expressly conditions its offer of a $75,000 annual salary on Defendants winning both dispensary and cultivation licenses.

151.    In the event Defendants did not win both cultivation and dispensary licenses, they expressly agreed in the CMO Agreement to provide Mr. Silver with a "replacement offer letter, which [he could] accept or reject."

152.     Although the CMO Agreement dealt with the Defendants' promise to provide Mr. Silver with an ongoing role as Chief Marketing Officer, the Defendants continued to drag their feet on reducing to writing their other promises to Mr. Silver.

153.     Meanwhile, the Pennsylvania applications were due on March 20, and Mr. Silver was working day and night to prepare them.

154.     On March 20, Messrs. Murphy and Yellin finally presented Mr. Silver with a document to sign.  Mr. Murphy stated that the document contained all the provisions the parties had previously agreed to and flipped to the signature page and asked Mr. Silver to sign it immediately.

155.     Mr. Silver expected Messrs. Murphy and Yellin to present him with the Google Doc that they had regularly shared among themselves.  But when he looked at the front page he noticed that it was not the Google Doc that he had previously exchanged with Messrs. Murphy and Yellin.  Instead, they presented him with a new document that he had never previously seen.

156.     Accordingly, Mr. Silver declined to sign this brand new document and asked Messrs. Murphy and Yellin to simply sign the term sheet that they had previously received and accepted without comment.

157.     Messrs. Murphy and Yellin, however, refused to do so.  Instead, they refused to sign anything other than the term sheet that the parties had exchanged on December 12.

158.     Mr. Murphy then grabbed a document from his desk and asserted that it was the December version of the term sheet.

159.     Mr. Murphy's statement was a lie. Although the document he presented was formatted to look like the parties' Google Doc, it was actually a document that Mr. Silver had never previously seen, much less reviewed.

160.    At that point, Mr. Silver refused to sign Mr. Murphy's document and explained that Google Docs automatically saves all revisions.  Accordingly, Mr. Silver opened his laptop, went to the Google Doc revision history, and showed Mr. Murphy that revision history.

161.    Mr. Murphy then identified the date of the version that he wanted, which was the December 12 term sheet.

162.    Mr. Silver printed that version and Mr. Murphy made handwritten edits to it to reflect the meeting of the minds that had occurred on December 13 with respect to Mr. Silver's 4% non-dilutable equity stake in any licensee.

163.    The parties then signed the term sheet.  The signed term sheet is attached hereto as Exhibit 10.

164.    The handwritten edit in which Mr. Murphy himself wrote that Mr. Silver would receive a 4% equity stake in any licensee is located at paragraph 13 of Exhibit 10.

165.    In addition to the 4% non-dilutable equity stake in the licensee, the document signed by the parties on March 20 also promises Mr. Silver a $150,000 cash bonus for winning a cultivation license along with an ongoing role as the licensee's Chief Marketing Officer.

166.    Messrs. Murphy and Yellin also left the final drafting and execution of an LLC agreement for Prime Wellness to the last minute.  This document was essential because it was a required part of the application.

167.    Ultimately, Mr. Lenfest agreed to sign a copy of an LLC agreement for Prime Wellness, but only on the condition that it later be revised to reflect the actual terms of the agreement between Mr. Lenfest and High Street Capital.

168.    Mr. Silver completed and submitted the Pennsylvania applications later that evening.

## VIII. As Soon As Mr. Silver Completes His Work, Defendants Renege On Their Promises To Pay Him

169.     After he completed and submitted the Pennsylvania applications, Mr. Silver returned to California to have shoulder surgery.

170.     As Mr. Silver was recovering from the surgery, Defendants asked him to prepare materials related to the Drexel CR license proposal, which had advanced to the final round.

171.     During conversations about the additional work, Mr. Lenfest's associate, Christopher Noe, acknowledged that he and Mr. Lenfest knew that Mr. Silver had been promised a 4% equity interest in Prime Wellness in the event it was awarded a license.

172.     Mr. Silver prepared the materials and sent them to Defendants.

173.     Upon information and belief, Drexel has now selected Prime Wellness to be its exclusive partner for the purposes of applying for CR licenses.

174.     In mid-April, Mr. Silver e-mailed Defendants with a list of action items to be completed during the quiet period in advance of the announcement of the license winners.

175.     Mr. Yellin responded by instructing Mr. Silver to do nothing until Messrs. Yellin and Murphy contacted him later that week.  Messrs. Yellin and Murphy, however, never contacted Mr. Silver.

176.     Around the same time, Mr. Silver learned that High Street Capital had hired another individual, Patrick Rutan, to lead their application efforts in Ohio.

177.     Mr. Rutan proceeded to reach out to all of Mr. Silver's contacts in an attempt to get them to work directly with High Street Capital, rather than with Mr. Silver.

178.     In short, as soon as the Defendants got what they wanted from Mr. Silver with respect to the Pennsylvania license application and the Drexel application, they cut off all contact with him.

179.    On June 27, Prime Wellness was awarded a Pennsylvania cannabis cultivation license.  It was not awarded a dispensary license.

180.    Following Prime Wellness's victory, Mr. Silver contacted Defendants regarding the additional compensation he was due and about his role as Chief Marketing Officer of Prime Wellness.

181.    Defendants, through their attorney, informed Mr. Silver that they were not going to perform on any of the promises they had made to him and that he would not be Prime Wellness's Chief Marketing Officer.  This repudiation both breached the earlier agreement with Mr. Silver and directly contradicted the representations that Defendants had made in their cultivation licensing application (which was granted), which stated that Mr. Silver would be the Chief Marketing Officer of Prime Wellness.  The organizational chart Defendants submitted to the state in connection with their successful cultivation licensing application is attached hereto as Exhibit 11.

182.    At no time did Defendants provide Mr. Silver with a "replacement offer letter," as required under the CMO Agreement.

183.    In light of Defendants' lengthy foot-dragging when it came to memorializing their agreement with Mr. Silver in a signed writing, their last-minute effort to dupe him into signing a written document that he had never previously seen, and their conduct immediately after Mr. Silver completed his work for them, it is clear that they never had any intention of abiding by any of the promises they made to him.  Those promises were false and fraudulent when made.

184.    Upon information and belief, Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC currently own all of the equity interests in Prime Wellness, including the 4% equity interest that rightfully belongs to Mr. Silver.

### IX.    Based On Defendants' Promises, Mr. Silver Turned Down Other Lucrative Consulting Opportunities

185.    As discussed above, Mr. Silver told Defendants that other cannabis companies wanted him to quarterback their Pennsylvania cannabis applications.

186.    Mr. Silver turned down those opportunities only because of the promises Defendants made to him, including that he would receive a 4% equity stake in any licensee, a $150,000 cash bonus and an ongoing position as Chief Marketing Officer of the licensee.

187.    Consistent with the agreement he made in December with High Street Capital, Mr. Silver's contracts for preparing cannabis applications typically provide him with guaranteed cash compensation and a significant equity stake in any licensee.

188.    Those arms-length agreements demonstrate the reasonable, market-tested value of Mr. Silver's services.

189.    Thus, the best evidence of the reasonable value of Mr. Silver's services is the arms-length agreement he made with Defendants, and, in any event, far exceeds the $180,000 that he has received thus far.

190.    In addition, if Mr. Silver had not been duped by Defendants' fraud, he would have led the Pennsylvania application efforts of one of the other companies that had sought out his services and would have earned far more than $180,000 from that work.

### X.    Prime Wellness's LLC Agreement Grants High Street Capital Sole Control Over its Operations

191.    As discussed above, after Mr. Lenfest agreed jointly to apply for Pennsylvania cannabis licenses with High Street Capital, they did not promptly formalize their relationship

28

into written documents or immediately form a limited liability company or any other entity

through which would conduct their joint venture.

192.     Instead, from the time Mr. Lenfest came on board until mid-March, he and High

Street Capital operated a joint venture as partners.

193.     During that period, Mr. Lenfest personally made specific demands upon Mr.

Silver in connection with his work on the Drexel RFI proposal and the cultivation and dispensary

license applications.

194.     Likewise, Mr. Lenfest's lieutenant, Christopher Noe, began directing Mr. Silver

with respect to, among other things, the Drexel RFI response as early as December 2016.

195.     It was not until March 15, 2017 that Mr. Lenfest and High Street Capital signed a

letter of intent ("LOI") to govern their relationship going forward.

196.     The LOI is attached hereto as Exhibit 12.

197.     In that agreement, Mr. Lenfest agreed to participate as an investor in Prime

Wellness via one of his wholly-owned entities called HCL MM Investments PA, LLC.

198.     The LOI states that "[o]verall management of the Company shall be vested in a

Board of Managers (the "Board") . . . consisting of five members comprised of (i) two

appointees of Lenfest and (ii) three appointees of HSCP."  LOI ¶ 6(b).

199.     In addition, "the Board shall have full, plenary, exclusive and complete power and

authority to manage and control the Company."  *Id.*

200.     To the extent that Mr. Silver would be hired by PWPA after the award of a

license, the parties understood and agreed that he would not be PWPA's Chief Executive Officer.

201.    Instead, Mr. Silver's role as Chief Marketing Officer would be a subordinate role directing the company's marketing and branding activities and reporting to more senior PWPA executives.

202.    Ultimately, following PWPA's receipt of a cannabis cultivation license, Mr. Silver was not hired by PWPA in any capacity.

## XI.    The Parties Understood That Mr. Silver Would Perform Much Of His Work In Pennsylvania And He In Fact Did So

203.    From the beginning of his discussions with High Street Capital, Mr. Silver explained that he personally would need to spend significant time in Pennsylvania to complete the work he needed to do on the applications.

204.    For example, Mr. Silver explained to Messrs. Murphy and Yellin the importance of personally meeting face-to-face with local partners and personally inspecting potential sites for cultivation facilities.

205.    Indeed, an early budget Mr. Silver sent High Street Capital in connection with the November 7 term sheet allocated 10% of the initial payment to cover his travel expenses to and from Pennsylvania.

206.    Thus, when Defendants agreed to hire Mr. Silver to prepare their Pennsylvania applications, they knew that a substantial amount of his performance would occur in Pennsylvania.

207.    Mr. Silver did in fact travel to Pennsylvania on several occasions in connection with preparing the cannabis applications for the Defendants.

208.    For example, from January 30 to February 1, 2017, Mr. Silver spent three days in Pennsylvania discussing potential development sites with local economic development officials,

meeting with real estate agents and architects, visiting potential sites for cultivation and dispensary facilities and recruiting new team members.

209.    In addition, during a separate trip, Mr. Silver traveled with Mr. Yellin to Philadelphia to meet and interview several candidates for the licensee's executive team.

## COUNT I
## BREACH OF CONTRACT
**(Against Defendants H. Chase Lenfest, High Street Capital and Prime Wellness)**

210.    Plaintiffs incorporate by reference all preceding paragraphs.

211.    Plaintiffs entered into an agreement with Defendants H. Chase Lenfest and High Street Capital to prepare Pennsylvania cannabis applications for them and in their capacity as promotors of Defendant Prime Wellness.

212.    Defendant Prime Wellness assumed that contract and received the benefits of it by, among other things, being awarded a cannabis cultivation license based on the applications prepared by Plaintiffs.

213.    Plaintiffs fulfilled their obligations under the contract by preparing and submitting cannabis applications for Defendants.

214.    Plaintiffs' contingent compensation under the contract became due when Defendant Prime Wellness was awarded a cannabis cultivation license.

215.    Defendants H. Chase Lenfest, High Street Capital and Prime Wellness breached their contract with Plaintiffs, and thereby injured them, by failing to pay Plaintiffs their contingent compensation, including, without limitation, the $150,000 cash bonus, a 4% non-dilutable equity stake in the licensee and an ongoing role as the licensee's Chief Marketing Officer.

WHEREFORE, Plaintiffs seek a judgment awarding them

31

    a.  compensatory damages in an amount to be proved at trial;

    b.  pre- and post-judgment interest; and

    c.  any further relief that the Court's deems just and proper.


## <u>COUNT II</u>
## PROMISSORY ESTOPPEL
### (Against H. Chase Lenfest, High Street Capital and Prime Wellness)

216.    Plaintiffs incorporate by reference all preceding paragraphs.

217.    This Count is pleaded in the alternative in the event it is determined that there was no enforceable contract between Plaintiffs and Defendants.

218.    Defendants Kevin Murphy and Melvin Yellin made a series of promises to Plaintiffs about the contingent consideration they would receive in the event the applications they prepared resulted in Defendants being awarded a cannabis license.

219.    When making the promises, Messrs. Murphy and Yellin were acting in their capacity as agents for Defendants H. Chase Lenfest, High Street Capital and Prime Wellness.

220.    Defendants reasonably expected those promises to induce Plaintiffs to act.

221.    Plaintiffs did in fact rely on those promises when they performed the work necessary to prepare the applications.

222.    Injustice can be avoided only by enforcing the promises.

WHEREFORE, Plaintiffs seek a judgment awarding them

    a.  compensatory damages in an amount to be proved at trial;

    b.  pre- and post-judgment interest; and

    c.  any further relief that the Court's deems just and proper.

## COUNT III
## UNJUST ENRICHMENT/QUANTUM MERUIT
### (Against H. Chase Lenfest, High Street Capital and Prime Wellness)

223.    Plaintiffs incorporate by reference all preceding paragraphs.

224.    This Count is pleaded in the alternative in the event it is determined that there was no enforceable contract between Plaintiffs and Defendants.

225.    Plaintiffs conferred a benefit on Defendants H. Chase Lenfest, High Street Capital and Prime Wellness by preparing cannabis license applications on their behalf that ultimately resulted in Prime Wellness obtaining a cannabis license.

226.    Defendants H. Chase Lenfest, High Street Capital and Prime Wellness appreciated this benefit because they knew of the work performed by Plaintiffs.

227.    It would be inequitable to permit Defendants H. Chase Lenfest, High Street Capital and Prime Wellness to retain all of the benefits conferred upon them without properly compensating Plaintiffs for their efforts.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  pre- and post-judgment interest; and

      c.  any further relief that the Court's deems just and proper.

## COUNT IV
## COMMON LAW FRAUD
### (Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)

228.    Plaintiffs incorporate by reference all preceding paragraphs.

229.    Defendants Kevin Murphy and Melvin Yellin made material factual representations to Plaintiffs by repeatedly promising to pay them contingent compensation in the

event Defendants were awarded a cannabis license, even though Defendants had no intention of ever keeping those promises.

230.    Defendants Kevin Murphy and Melvin Yellin specifically intended Plaintiffs to rely on those false statements and Plaintiffs did, in fact, justifiably rely on those statements.

231.    The false statements of Messrs. Murphy and Yellin injured Plaintiffs by inducing them to perform work for which they have not been fully and properly compensated.

232.    In making the false statements, Messrs. Murphy and Yellin acted as the agents of Defendants H. Chase Lenfest, High Street Capital and Prime Wellness.  Accordingly, Defendants H. Chase Lenfest, High Street Capital and Prime Wellness are vicariously liable for those false statements.

WHEREFORE, Plaintiffs seek a judgment awarding them

    a.  compensatory damages in an amount to be proved at trial;

    b.  punitive damages;

    c.  pre- and post-judgment interest; and

    d.  any further relief that the Court's deems just and proper.

## COUNT V
### SECURITIES FRAUD
**(Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)**

233.    Plaintiffs incorporate by reference all preceding paragraphs.

234.    The membership interests in Prime Wellness that Mr. Silver was promised are securities covered by Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

235.    Defendants Kevin Murphy and Melvin Yellin made material factual representations to Plaintiffs by repeatedly promising to pay them contingent compensation,

including membership interests in Prime Wellness, even though Defendants had no intention of ever keeping those promises.  Thus, the fraudulent statements of Messrs. Murphy and Yellin were made in connection with the purchase or sale of securities.

236.    Defendants Kevin Murphy and Melvin Yellin specifically intended Plaintiffs to rely on those false statements and Plaintiffs did, in fact, rely on those statements.

237.    The false statements of Messrs. Murphy and Yellin caused Plaintiffs to suffer damages by inducing them to perform work for which they have not been fully and properly compensated.

238.    In making the false statements, Messrs. Murphy and Yellin acted as the agents of Defendants H. Chase Lenfest, High Street Capital and Prime Wellness.  Accordingly, Defendants H. Chase Lenfest, High Street Capital and Prime Wellness are vicariously liable for those false statements.

WHEREFORE, Plaintiffs seek a judgment awarding them

a.  compensatory damages in an amount to be proved at trial;

b.  pre- and post-judgment interest; and

c.  any further relief that the Court's deems just and proper.

## COUNT VI
## CIVIL CONSPIRACY
### (Against Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin, High Street Capital and Prime Wellness)

239.    Plaintiffs incorporate by reference all preceding paragraphs.

240.    Defendants H. Chase Lenfest, Kevin Murphy and Melvin Yellin agreed to induce Plaintiffs to prepare cannabis applications for them on the false promise that they would receive additional consideration in the event the applications resulted in the award of a cannabis license.

241.    Defendants H. Chase Lenfest, Kevin Murphy, Melvin Yellin and their agents engaged in numerous overt acts in furtherance of the conspiracy, including repeatedly and falsely promising Plaintiffs that they would receive the contingent consideration to which the parties had agreed and repeatedly urging Plaintiffs to continue their work on the applications.

242.    The conspiracy resulted in actual legal damage to Plaintiffs by inducing them to to perform work for which they have not been fully and properly compensated.

243.    Defendants High Street Capital and Prime Wellness are vicariously liable for the conspiracy entered into by Messrs. Lenfest, Murphy and Yellin.

WHEREFORE, Plaintiffs seek a judgment awarding them

      a.  compensatory damages in an amount to be proved at trial;

      b.  punitive damages;

      c.  pre- and post-judgment interest; and

      d.  any further relief that the Court's deems just and proper.

### COUNT VII
### UNJUST ENRICHMENT
**(Against Defendants High Street Capital Partners, LLC and
HCL MM Investments PA, LLC)**

244.    Plaintiffs incorporate by reference all preceding paragraphs.

245.    Plaintiffs conferred a benefit on Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC by causing the LLC of which they are the sole members, Prime Wellness, to be awarded a cannabis license.

246.    Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC knew appreciated the benefit because their officers and members had personal knowledge of the work performed by Plaintiffs in connection with the license applications.

247.    Defendants High Street Capital Partners, LLC and HCL MM Investments PA, LLC have retained property, namely a 4% non-dilutable equity stake in Prime Wellness, that properly belongs to Plaintiffs and it would be inequitable to permit them to retain that property.

WHEREFORE, Plaintiffs seek a judgment awarding them

        a.  compensatory damages in an amount to be proved at trial;

        b.  pre- and post-judgment interest; and

        c.  any further relief that the Court's deems just and proper.

## Jury Demand

Plaintiffs request a jury trial on all issues so triable.

Respectfully submitted,


  /s/Peter J. Kreher                          
Peter J. Kreher
pete@krehertrapani.com
Francesco P. Trapani
frank@krehertrapani.com
Kreher & Trapani LLP
1325 Spruce St.
Philadelphia, PA  19107
Phone:  (215) 907-7288
Fax:  (215) 907-7287

Mark W. Tanner
mtanner@feldmanshepherd.com
Feldman Shepherd Wohlgelernter
  Tanner Weinstock & Dodig, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA  19103
Phone:  (215) 567-8300

*Attorney for Plaintiffs Harris Silver
and Entity X, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Peter J. Kreher, caused the foregoing Amended Complaint to be served on all counsel of record by hand-delivering it to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania, where it will be uploaded to the Court's ECF system for viewing and downloading.


      /s/Peter J. Kreher

      Peter J. Kreher